**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 3 1997**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KARIN SOFIA OHLANDER, In the
Matter of Julia Larson, a Minor Child,
f/k/a Karin Sofia Larson,

    Petitioner-Appellant,

v.

MARK ANDREW LARSON,

    Respondent-Appellee.

Nos. 95-4114
& 96-4080

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 94-CV-87)**

---

Daniel F. Bertch (Billie C. Nielsen, with him on the brief), of Bertch & Birch,
Salt Lake City, Utah, for Petitioner-Appellant.

Gary L. Paxton (Rodney G. Snow with him on the briefs) of Clyde, Snow &
Swenson, P.C., Salt Lake City, Utah, for Respondent-Appellee.

---

Before **BRORBY, BARRETT** and **MURPHY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

Ms. Ohlander appeals the United States District Court for the District of Utah's judgment denying her petition for the return of her daughter Julia to Sweden under the Hague Convention, ordering Julia's return to Utah, denying her two motions to withdraw and dismiss her petition, denying her motions to stay enforcement of the judgment, and a subsequent judgment denying her Fed. R. Civ. P. 60(b) motion to set aside the judgment.[1]  Applying the standards under Fed. R. Civ. P. 41(a)(2) in the Hague Convention context, we determine the district court abused its discretion in denying the motion to dismiss.  We reverse and remand to the district court with instructions to dismiss Ms. Ohlander's petition.

## I.  BACKGROUND

The Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), as implemented by both the United States Congress through the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-11610 (1994), and Sweden, was adopted by the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence."  Hague Convention on the Civil Aspects of

---

[1]  Ms. Ohlander's appeal of the district court's denial of her motion to set aside the judgment under Fed. R. Civ. P. 60(b) was consolidated with the direct appeal.

International Child Abduction, Dec. 23, 1981, Preamble, 51 Fed. Reg. 10494, 10,498 (1986). The Convention is meant to provide for a child's prompt return once it has been established the child has been "wrongfully removed" to or retained in any affiliated state. *Id.*, art. 1, 51 Fed. Reg. at 10498.

> Under the Convention, a removal or retention is "wrongful" if:
>
> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for removal or retention.

*Id.*, art. 3, 51 Fed. Reg. at 10498. Once a removal is deemed "wrongful," "the authority concerned shall order the return of the child." *Id.*, art. 12, 51 Fed. Reg. at 10499. However, the Convention provides for several exceptions to return if the person opposing return can show any of the following: 1) the person requesting return was not, at the time of the retention or removal, actually exercising custody rights or had consented to or subsequently acquiesced in the removal or retention, *id.*, art. 13a, 51 Fed. Reg. at 10499, 42 U.S.C. § 11603(e)(2)(A); 2) the return of the child would result in grave risk of physical or psychological harm to the child, *id.*, art. 13b, 42 U.S.C. § 11603(e)(2)(A); 3) the return of the child "would not be permitted by the fundamental principles of

the requested State relating to the protection of human rights and fundamental freedoms," *id.*, art. 20, 51 Fed. Reg. at 10500, 42 U.S.C. § 11603(e)(2)(A); or 4) the proceeding was commenced more than one year after the abduction and the child has become settled in the new environment, *id.*, art. 12, 51 Fed. Reg. at 10499, 42 U.S.C. § 11603(e)(2)(B).

## II. FACTS

Ms. Ohlander, a Swedish citizen, and Mr. Larson, a United States citizen, were married in Utah in 1989. In August 1990, their daughter Julia was born in Provo, Utah. During the Christmas holiday season of 1990-91, when Julia was five months old, the entire family traveled to Sweden to visit Ms. Ohlander's family with the intent to return to their Utah home in January 1991. After arriving in Sweden, Ms. Ohlander decided to remain in Sweden with Julia; Ms. Ohlander went into hiding with her daughter and severed contact with her husband. Mr. Larson returned to Utah alone in mid-January 1991.

By April 1991, Mr. Larson had reestablished contact with Ms. Ohlander. In June 1991, with Julia now almost a year old, Ms. Ohlander returned to Utah to be with Mr. Larson. Ms. Ohlander and Julia remained with Mr. Larson for seven

months.  On January 13, 1992, Ms. Ohlander returned with Julia to Sweden without Mr. Larson's consent.

By November 1993,[2] Julia had resided continuously in Sweden for almost two years, and was a little over three years old.  Mr. Larson returned to Sweden with his new wife to see Julia, and during one visitation, applied the law of "grab and run" taking Julia back to Utah without Ms. Ohlander's consent.  In January 1994, Ms. Ohlander filed a petition seeking her daughter's return pursuant to the Hague Convention in the United States District Court for the District of Utah.  Ms. Ohlander also secured an *ex parte* Order for Issuance of Warrant in Lieu of Writ of Habeas Corpus from the district court, directing peace officers to take Julia into protective custody and to release her to Ms. Ohlander, but prohibiting Ms. Ohlander from removing Julia from Utah pending further order.  Mr. Larson delivered Julia to Ms. Ohlander on January 30, 1994, and on February 1, 1994, Ms. Ohlander disobeyed the court's order and applied her own version of the law of "grab and run" by returning to Sweden with Julia.

---

[2] Between January 1992 and November 1993, Ms. Ohlander and Mr. Larson were participating in divorce and custody proceedings taking place in Sweden.

In August 1994, shortly after Julia's fourth birthday, the district court entered an order finding Ms. Ohlander in contempt and directing her to return Julia to the United States within thirty days. Ms. Ohlander failed to comply. Two months later, in October 1994, following Ms. Ohlander's and Julia's return to Sweden, Mr. Larson filed a Convention application for Julia's return with the United States Central Authority, which was forwarded to Sweden's Central[3] Ms. Ohlander then filed a motion, pursuant to Fed. R. Civ. P. 41(a)(2), to dismiss her district court petition, based, in part, on the Convention's art. 12, which authorizes a judicial authority to stay or dismiss the application or judicial proceedings seeking a child's return.[4] Hague Convention, art. 12, 51 Fed. Reg. at 10499. In January 1995, prior to the hearing on Ms. Ohlander's motion, Mr. Larson

_____

[3] 42 U.S.C. § 11602 distinguishes between applications and petitions filed under the Convention. A petition exists upon a person filing for relief in court, while an application exists upon a person filing with the United States' or any other country's Central Authority for a child's return. 42 U.S.C. § 11602(1), (4).

[4] Specifically, the Convention's art. 12 states:

Where the judicial or administrative authority in the requested State has reason to believe that the child has been taken to another state, it may stay the proceedings, or dismiss the application for the return of the child.

Hague Convention, art. 12, 51 Fed. Reg. at 10499.

petitioned the Sweden court pursuant to the Convention for Julia's return on the ground Ms. Ohlander had "wrongfully removed" her from Utah.[5]

The United States district court conducted a hearing on Ms. Ohlander's motion to dismiss. During that hearing, the United States district court was informed of Mr. Larson's Hague Convention proceeding in Sweden. The district court denied the motion to dismiss solely on the basis of Ms. Ohlander's contempt of its order not to remove Julia from Utah. Ms. Ohlander later orally renewed her motion to dismiss, which the district court denied on the same grounds.

The district court conducted a bench trial on Ms. Ohlander's Hague Convention petition to determine the issues of habitual residence and wrongful removal pursuant to the Convention. However, neither Ms. Ohlander nor Julia was present for the hearing, nor did they testify by other means. Ms. Ohlander presented no live witnesses and relied only on the stipulated facts set out in the Pretrial Order. Ultimately, the district court found Julia was at all times a "habitual resident" of Utah, and as such, Ms. Ohlander's retention of Julia in

---

[5] Presumably, Mr. Larson filed the petition in addition to the application to prevent Ms. Ohlander from asserting the "settled environment" defense as it pertained to Ms. Ohlander's 1994 removal. This defense is discussed *infra* at pp. 21-22.

Sweden in 1991, and her removals of Julia from Utah in 1992 and 1994 were all "wrongful" under the Convention. Accordingly, the district court ordered Julia's immediate return to Utah and requested the aid of the Contracting States in achieving that goal.

Following the United States district court's decision, the Sweden courts held hearings to determine the merits of Mr. Larson's petition. Both Mr. Larson and Ms. Ohlander were present during the Sweden court proceeding. The Sweden Supreme Administrative Court held Julia's habitual residence changed from Utah to Sweden after she had lived in Sweden for twelve months following the January 1992 abduction -- a decision directly in conflict with the United States district court's holding.

Once the Sweden court had made its ruling, Ms. Ohlander filed a motion to stay enforcement of the United States district court's order, and a motion to set aside the United States' judgment under Fed. R. Civ. P. 60(b). The United States district court denied the motions, again solely on the basis of Ms. Ohlander's contempt. We are presented, therefore, with two international decisions standing in direct conflict, and it is this contradiction we attempt to resolve for both the present case and for future cases.

## III. DISCUSSION

This case presents issues novel to this court, and according to our research, novel to this country. Our aim is to provide courts with guidance in future similar cases, namely, where two civil actions under the Hague Convention on the Civil Aspects of International Child Abductions are filed in disparate courts due to a child's removal from the court of first jurisdiction. Also, our aim is to give meaning to the Convention's intended purpose of discouraging parents from fleeing with their children in search of a favorable decision. Notably, we are faced not only with issues of the proper interpretation of bare text in the form of the Hague Convention treaty, but also with the plight of a now six-year-old girl to whom the law of "grab and run" repeatedly has been applied.

We therefore must examine the following competing interests of: the district court ensuring compliance with its orders; the procedural conduct of the parties; and most important, the Convention's intent and our duty to see that intent justly carried out. Against this backdrop, we attempt to untangle the Gordian knot the parents, together, have seen fit to tie.

## IV. MOTION TO DISMISS

Even though Ms. Ohlander appeals several of the district court's rulings, our decision on the motion to dismiss pursuant to Fed. R. Civ. P. 41(a)(2) is dispositive. Thus, we need not address the remaining issues. We therefore turn our focus to whether the district court abused its discretion in denying Ms. Ohlander's motion to dismiss pursuant to Fed. R. Civ. P. 41(a)(2).

### A. *Relevant Facts*

Ms. Ohlander's first motion to dismiss was filed shortly after Mr. Larson filed his Hague application for Julia's return to Utah with the United States Central Authority. Ms. Ohlander's counsel raised her second motion to dismiss orally during the bench trial. Relying on the Convention's art. 12, Ms. Ohlander argued in her first motion to dismiss that because Julia was no longer in the United States and because Mr. Larson had initiated his own Hague Convention application, the United States district court should dismiss the petition for Julia's return to Sweden. By the time the United States district court heard arguments regarding the first motion to dismiss, Mr. Larson had initiated his own petition in the Sweden courts regarding the wrongfulness of Julia's removal from the United States. The district court was aware of the duplicative judicial action in Sweden. Notwithstanding its knowledge of Mr. Larson's Hague Convention proceedings in

-10-

Sweden, the district court summarily denied Ms. Ohlander's motion solely on the basis of Ms. Ohlander's contempt stating:

> I'm not going to grant the Motion to Dismiss and I'm not going to grant it simply because this woman, the petitioner, in my opinion, isn't in a position to ask me to do that, because she's in violation of the orders of this Court. She is simply in violation. She invoked the jurisdiction. She asked for our help, and then she, contrary to the order of the Court, ran.

In her second motion to dismiss, Ms. Ohlander relied again on the Convention's art. 12, the fact that Julia was no longer in the United States, and the fact that Mr. Larson had initiated judicial proceedings in Sweden. The district court again denied Ms. Ohlander's second motion to dismiss due to her contumacious conduct.

### B. Relevant Factors Considered Under 41(a)(2)/Standard of Review

Once a defendant files an answer, as was the case here, a plaintiff may voluntarily dismiss an action only upon order of the court. Fed. R. Civ. P. 41(a)(2). We review the district court's decision to deny a voluntary dismissal under such conditions for abuse of discretion. *American Nat'l Bank & Trust Co. v. Bic Corp.*, 931 F.2d 1411, 1412 (10th Cir. 1991). Absent "legal prejudice" to the defendant, the district court normally should grant such a dismissal. *See Andes v. Versant Corp.*, 788 F.2d 1033, 1036 (4th Cir. 1986) (voluntary dismissal "should not be denied absent substantial prejudice to the defendant"); *McCants v. Ford Motor Co.*, 781 F.2d 855, 856-57 (11th Cir. 1986) ("in most cases a

-11-

dismissal should be granted unless the defendant will suffer clear legal prejudice"). The parameters of what constitutes "legal prejudice" are not entirely clear, but relevant factors the district court should consider include: the opposing party's effort and expense in preparing for trial; excessive delay and lack of diligence on the part of the movant; insufficient explanation of the need for a dismissal; and the present stage of litigation. *Phillips U.S.A., Inc. v. Allflex U.S.A., Inc.*, 77 F.3d 354, 358 (10th Cir. 1996). Each factor need not be resolved in favor of the moving party for dismissal to be appropriate, nor need each factor be resolved in favor of the opposing party for denial of the motion to be proper. *Id.* at 358.

The above list of factors is by no means exclusive. *Id.* at 358. Any other relevant factors should come into the district court's equation. In fact, in the context of this Hague Convention proceeding, the district court was impressed with a duty to exercise its discretion by carefully appraising any additional factors unique to the context of this case, including the interests in comity, uniform interpretation of the Convention and the importance of giving import to the Hague Convention's intended purpose as relevant to the motion to dismiss.

The district court should endeavor to insure substantial justice is accorded to both parties. 9 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2364 at 278 (2d ed. 1994). A court, therefore, must consider the equities not only facing the defendant, but also those facing the plaintiff; a court's refusal to do so is a denial of a full and complete exercise of judicial discretion. *Id.* at 297. In a complex, emotional case such as this, it is critically important when considering a motion to dismiss, the court give the equities of the plaintiff the attention deserved.

Finally, when considering a motion to dismiss, a court must remember the important factors in determining legal prejudice are those involving the parties, not the court's time or effort spent on the case. *Clark v. Tansy*, 13 F.3d 1407, 1411 (10th Cir. 1993). A court abuses its discretion when denying a motion to dismiss under Rule 41(a)(2) based on its inconvenience. *Id.* at 1411.

In sum, the district court was obligated to consider the novelty of the circumstances surrounding this case. Instead, the court did not consider the merits of Ms. Ohlander's motion due exclusively to her contumacious conduct. It is true Ms. Ohlander blatantly violated the court's orders and absconded to Sweden with Julia in tow. We refuse to condone such conduct. However, neither

can we condone a court ignoring its duty to consider the merits of a motion to dismiss simply because a party has violated its orders. Whether a motion to dismiss under Rule 41(a)(2) may be granted is a matter initially left to the district court's discretion, but such discretion does not excuse a court's failure to exercise any discretion, nor does it save an unpermitted exercise of discretion from reversal. *Alamance Indus., Inc. v. Filene's*, 291 F.2d 142, 146-47 (1st Cir.), *cert. denied*, 368 U.S. 831 (1961). A clear example of an abuse of discretion exists where the trial court fails to consider the applicable legal standard or the facts upon which the exercise of its discretionary judgment is based. *See McNickle v. Bankers Life & Cas. Co.*, 888 F.2d 678, 680 (10th Cir. 1989) (reviewing a district court's 60(a) motion under an abuse of discretion standard). We believe the district court's decision to deny Ms. Ohlander's motion solely on the grounds of her contempt and without considering any additional circumstances, amounts to a failure to exercise discretion, and is, consequently, an abuse of that discretion.

### C. Merits of Ms. Ohlander's 41(a)(2) Motion

#### 1. Traditional Factors

Although the district court's failure to apply the correct legal standard could serve as a basis for remand, in the interest of efficiency and judicial economy, and in the interest of providing immediate guidance as to the most appropriate

direction of this case in light of the Convention's purpose, we turn to the merits of Ms. Ohlander's motion to dismiss. *Clark*, 13 F.3d at 1411-13 (considering on appeal the merits of motion to dismiss after district court abused its discretion); *Park City Resource Council v. United States Dept. of Agric.*, 817 F.2d 609, 617-18 (10th Cir. 1987) ("Although failure to apply correct legal standard could be basis for remand to the district court, we have found that remand is not necessary where there is no dispute regarding the underlying facts and where it is in the interest of judicial economy and efficiency to decide the matter."); *see also McCord v. Bailey*, 636 F.2d 606, 613 (D.C. Cir. 1980) (although inadequate findings and conclusions may be remanded to the district court for supplementation, appellate court will not remand for more specific findings if doing so will consume judicial resources without serving any purpose). We believe, as is obvious from our remaining analysis, no dispute regarding the underlying facts exists and the existing record is adequate to address the issues of concern.

Mr. Larson argues that to grant Ms. Ohlander's motion would subject him to legal prejudice. More specifically, Mr. Larson argues he would be unfairly prejudiced by Ms. Ohlander's excessive delay and lack of diligence, and by the lack of a sufficient explanation in favor of dismissal. *See Allflex*, 77 F.3d at 358.

Mr. Larson argues Ms. Ohlander's filing of her motion to dismiss eleven months after the initiation of the proceedings and after Mr. Larson had requested a final pretrial hearing constitutes delay and lack of diligence. However, while Ms. Ohlander moved to dismiss her petition eleven months after she initiated the proceeding, our examination of the record illustrates Ms. Ohlander filed her motion to dismiss *only after* Mr. Larson had filed his application for Julia's return with the United States Central Authority. Therefore, the most persuasive reason to file a motion to dismiss did not arise until eleven months following the initial proceeding's initiation. As a result, the timing of Ms. Ohlander's motion could not constitute excessive delay sufficient to legally prejudice Mr. Larson. Moreover, the record shows Ms. Ohlander's counsel was actively and diligently moving forward with the case regardless of Ms. Ohlander's absence. Counsel was present at and participated in every hearing.[6] Therefore, we conclude there was

---

[6] The dissent opines our statement here "is a conclusory statement lacking support in the record" because between the time Ms. Ohlander initiated the Convention proceeding and filed her motion to dismiss, Ms. Ohlander "did virtually nothing to affirmatively move her case along." Unfortunately, this court has yet to explicitly define "diligence" in the context of a Rule 41(a)(2) motion to dismiss. While the dissent purports an "affirmative act" requirement, the cases from this circuit touching on the issue characterize diligence quite differently. *Allflex*, 77 F.3d at 358 (movant's request for additional time to respond to proffered facts and to conduct further discovery constituted lack of diligence); *Clark*, 13 F.3d at 1412 (movant's failure to exhaust state claims for purposes of habeas review "cannot be construed as lack of diligence"); *see also, United States v. Outboard Marine Corp*, 780 F.2d 497, 504 (7th Cir. 1985) (lack of diligence may be shown by evidence of bad faith or unwarranted delay). We are not certain

no improper delay or lack of diligence on Ms. Ohlander's part sufficient to legally prejudice Mr. Larson.

Further, we believe the reasons Ms. Ohlander has given for granting the motion to dismiss are not insufficient such that they prejudice Mr. Larson. In her motions to dismiss, Ms. Ohlander argued her petition was moot and because Julia was no longer in Utah, the Convention's art. 12 allowed for a stay or dismissal of the proceedings. Ms. Ohlander also relied on the fact Mr. Larson himself initiated a duplicative action in Sweden as further support for the imposition of the Convention's art. 12 dismissal provision. Certainly, the first two reasons alone are insufficient to support a motion to dismiss and could give parents an undue incentive to flee from Hague Convention proceedings. However, as discussed at length below, we place greater weight on Ms. Ohlander's proffered reasons that Mr. Larson initiated a second action in Sweden and that the Convention's art. 12 lends support for dismissing the United States proceeding.

---

what "affirmative acts" the dissent would require, and to the extent it would require a movant to file additional motions prior to a motion to dismiss, all in the name of "affirmative acts," we disagree. In fact, affirmative acts to prolong litigation more typically provide a basis for finding excessive delay and lack of diligence. *See, e.g., Allflex*, 77 F.3d at 358. The record before us shows counsel was present at and fully participated in all hearings and, outside the motions to dismiss, which were timely filed, did not cause undue delay. Consequently, there is adequate support in the record to reach our conclusion.

Ms. Ohlander's reasons for requesting the motion to dismiss are not insufficient such that they legally prejudice Mr. Larson. Rather, as Ms. Ohlander emphasizes, by initiating a judicial proceeding in Sweden Mr. Larson himself, along with the Convention's terms, provided the most persuasive reason to dismiss the United States district court proceeding. Mr. Larson is hard pressed to argue he is prejudiced by his own actions.

Mr. Larson also argues the motion to dismiss should not be granted because his response to Ms. Ohlander's Hague Convention petition should be construed as a counterclaim. It is true a court may construe a pleading mistakenly designated as a defense as a counterclaim when justice requires. Fed. R. Civ. P. 8(c). However, because Mr. Larson filed his own Hague Convention petition in Sweden, we remain unconvinced justice requires us to construe Mr. Larson's response to Ms. Ohlander's petition as a counterclaim in this case. Mr. Larson chose to assert his claims in a court of another jurisdiction. Justice does not require us to tortuously construe his response to Ms. Ohlander's petition simply to retain jurisdiction over this matter. Had Mr. Larson wanted the United States courts to adjudicate his claim Ms. Ohlander wrongfully removed Julia from Utah, he would have been far better served by filing a cross-petition with the district

court rather than initiating an entirely new proceeding in Sweden. Consequently,

we refuse to construe Mr. Larson's response as a counterclaim.[7]

## 2. Additional Relevant Factors

As already noted, given the unique circumstances of this case, the district

court should have considered the importance of a proper, uniform interpretation

of the Convention, along with a consideration of the Convention's purpose, when

---

[7] The dissent claims that by relying on the fact Mr. Larson initiated the second proceeding in Sweden we are somehow "punishing" Mr. Larson for enlisting the aid of the Sweden courts. On the contrary, we are only holding Mr. Larson accountable for his actions. Even though Julia was no longer within the United States when Mr. Larson filed the petition in Sweden, the United States court retained jurisdiction to determine Julia's state of habitual residence. *See* 42 U.S.C. § 11603(b). The United States district court had jurisdiction over the original petition as the court "in the place where the child is located at the time the petition is filed." Therefore, even though Julia was removed, the United States Court retained jurisdiction to determine the child's place of habitual residence. Additionally, the permissive lanugage of the Convention's art. 12 dismissal provision, which allows a court to stay or dismiss an action versus mandating a dismissal once a child is removed, suggests the United States court retained jurisdiction even after Julia was removed from Utah.

Rather than relying on the original action, Mr. Larson initiated a second proceeding, which has resulted in a ruling contrary to his interests and which has resulted in two conflicting international decisions, a problem we must somehow address. Certainly, we are not punishing him by subjecting him to the results of the proceeding he, in fact, initiated. Further, the fact Mr. Larson attempted to limit the Sweden court's jurisdiction is of no moment. Once Mr. Larson filed the petition in the Sweden court, that court had proper jurisdiction to determine Julia's place of habitual residence regardless of the fact Mr. Larson attempted to limit the Sweden court's review to the 1994 removal. Hague Convention, art. 3, 51 Fed. Reg. at 10498.

evaluating the merits of Ms. Ohlander's motion to dismiss. We now consider those factors.

### a. *Proper Interpretation of the Hague Convention's Procedures*

When the district court considered whether Ms. Ohlander's removal of Julia from Utah was wrongful, it misconstrued the Convention's contemplated procedures. According to the Convention, once a petition is filed, a court should consider only whether a *respondent's* removals of a child are wrongful. *See* Hague Convention, arts. 3, 12, 51 Fed. Reg. at 10498, 10499, 42 U.S.C. § 11603(b), (e). Here, antithetic to the Convention's intent as a whole, the court considered whether the *petitioner's* removals of the child were wrongful.

When Ms. Ohlander petitioned the United States district court for Julia's return to Sweden, the issue before the court was whether Mr. Larson's removal of Julia from Sweden was wrongful pursuant to the Convention. Hague Convention, art. 3, 51 Fed. Reg. at 10498. Once Ms. Ohlander removed Julia from Utah, the issue became whether Ms. Ohlander's removals were wrongful. *Id.* By filing his own petition in the Sweden courts, Mr. Larson chose to adjudicate Ms. Ohlander's removals of Julia in the foreign court rather than in the United States district court. The district court's consideration of Ms. Ohlander's removal of Julia

without Mr. Larson having filed a cross-petition in that court was contrary to the Convention's intended procedures.

Additionally, denial of Ms. Ohlander's motion to dismiss renders Ms. Ohlander's most relevant defense to Julia's return to Utah unavailable, namely, the "settled environment" defense. Hague Convention, art. 12, 51 Fed. Reg. at 10499, 42 U.S.C. § 11603(e)(2)(B). Under the Convention's plain terms, one defense to a child's return is showing the petition was filed a year after the child's removal or retention and that the child has become settled in his or her new environment. Hague Convention, art. 12, 51 Fed. Reg. at 10499, 42 U.S.C. § 11603(e)(2)(B). When Ms. Ohlander filed her petition, she was asking for Julia's return to Sweden; any defenses to Julia's return, under Article 12 or otherwise, were available only to the respondent, Mr. Larson. *See* Hague Convention, art. 12, 51 Fed. Reg. at 10499, 42 U.S.C. § 11603(e)(2)(B). Consequently, Ms. Ohlander could not, under the Convention's contemplated procedures, properly assert the "settled environment" defense. However, once Mr. Larson filed his own petition in Sweden seeking to adjudicate Ms. Ohlander's removal of Julia from Utah, Ms. Ohlander rightfully could assert the "settled environment" defense. Hague Convention, art. 12, 51 Fed. Reg. at 10499, 42 U.S.C. § 11603(e)(2)(B). Conversely, had Mr. Larson filed a cross-petition in the United States district

-21-

court for Julia's return to Utah, rather than instigating an entirely new action in Sweden, Ms. Ohlander properly could have asserted her defenses in the United States district court. Since Mr. Larson chose to initiate a second Convention proceeding in Sweden, Sweden was the jurisdiction where the claims and defenses of both Ms. Ohlander and Mr. Larson could be more fairly adjudicated. Therefore, the proper interpretation of the Convention weighs in favor of dismissing the United States action and allowing the issues to be decided in Sweden.[8]

This result is further supported by the plain language of the Convention's art. 12, which states "where the judicial or administrative authority in the requested State has reason to believe the child has been taken to another State, it may stay the proceedings or dismiss the application for the return of the child." Hague Convention, art. 12, 51 Fed. Reg. at 10499. While this language is

---

[8] The dissent takes issue with our interpretation of the availability of this defense to Ms. Ohlander. Apparently, the dissent interprets the Convention as restricting the Sweden court's review to Ms. Ohlander's 1994 removal of Julia and not to allow review of Ms. Ohlander's additional retentions and removals of Julia, particularly Ms. Ohlander's 1992 removal of Julia from Utah. We disagree with this interpretation. The Convention is intended to provide finality to the parties, and it is our duty to see this intent carried out. We note this is an extremely difficult case, dealing with the Convention's interpretation, an area singularly lacking in helpful precedent or congressional guidance. It is merely our duty to resolve this case as best we can in accordance with our interpretation of the Convention and to give import to the intentions of that Convention.

permissive rather than mandatory, its words merit a court's consideration when denying a motion to dismiss. Congress has declared the importance of "the need for uniform international interpretation of the Convention." 42 U.S.C. § 11601(b)(3)(B). Article 12 helps to ensure two disparate courts will not reach conflicting decisions by encouraging courts to dismiss or stay their actions where appropriate. This case poses a perfect example of the need for Article 12's dismissal provision: the United States district court had knowledge that Julia had been taken to Sweden, and that a second action initiated by Mr. Larson was pending in Sweden, where all the parties, including the child, were present. Therefore, we conclude the adherence to intended Hague Convention procedures support Ms. Ohlander's motion to dismiss.

### b. Intent of the Hague Convention

Failing to grant the motion to dismiss where a second duplicative action has been filed in a different country would potentially render the Hague Convention meaningless. Part of the Convention's intent is "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Convention, art. 1(b), 51 Fed. Reg. at 10498. Prior to the Convention, when faced with an unfavorable custody decision, a parent would flee to another country in search of a custody decision in his or her

favor. This would often result in two conflicting custody decisions without guidance as to which country's custody decision had preference. The Hague Convention was drafted with the intent to remove forever the incentive for a parent to flee across borders to obtain a favorable ruling. Letter of Transmittal from President Ronald Reagan (Oct. 30, 1985), reprinted in 51 Fed. Reg. 10494, 10,495 (1986); Pub. Notice 957, 51 Fed. Reg. 10494, 10505 (1986). Under the Convention, a child is to be expediently returned to his or her state of habitual residence "so that a court there can examine the merits of the custody dispute and award custody in the child's best interests." Pub. Notice 957, 51 Fed. Reg. at 10505. As a result, the Convention was meant, in part, to lend priority to the custody determination hailing from the child's state of habitual residence.

While the Convention proceedings in this case certainly have not achieved this intended result, a refusal to dismiss this action only exacerbates the problem. By failing to dismiss the United States action we would allow to stand two conflicting decisions regarding Julia's state of habitual residence, which could very well require a Hague Convention to determine which Hague Convention determination is valid. This, of course, is absurd. By dismissing this action, we instead require these and future litigants to choose which jurisdiction will

determine a child's state of habitual residence, thereby salvaging what we can of the Convention's intended purpose.[9]

Failing to grant the motion to dismiss also could create a new incentive for parents to flee Hague Convention proceedings in the hope of obtaining a second, more favorable Convention determination in another country. We then would be left to solve the riddle of which competing ruling in each case is valid. This is a task we refuse to acquire. Rather, we believe the parties' interests would be best represented and judicial resources best spent if parents engaged in this type international custody battle are required to resolve their dispute in one jurisdiction or the other. Holding Mr. Larson and future litigants to one jurisdiction gives import to the Convention's intended meaning.

### c. Ms. Ohlander's Contempt

Certainly, the court's interest in ensuring a party's compliance with its orders is a great one, enforceable by fines or imprisonment. *Spallone v. United States*, 493 U.S. 265, 276 (1990). However, a court is obliged to use the "'least

---

[9] The dissent opines our reliance on this factor is ironic because the conflict between the two decisions was merely "potential" at the time Mr. Larson filed the duplicative action in Sweden. It is precisely the "potential" conflict between different countries' custody decisions that made the Convention necessary.

possible power adequate to the end proposed.'" *Id.* at 276 (quoting *United States v. Yonkers*, 856 F.2d 444, 454 (2d Cir. 1988), and *Anderson v. Dunn*, 6 Wheat. 204, 231 (1821)). Here, certainly other measures were available to compel compliance, such as personal sanctions against the mother, or possibly staying a decision pending the child's return.

Under the provisions of the International Child Abduction Remedies Act, the district court has the authority to implement measures to "prevent the child's further removal or concealment before the final disposition of the petition." 42 U.S.C. § 11604. Given Ms. Ohlander's history of removing Julia from the United States, to prevent Ms. Ohlander from repeating this behavior, perhaps the district court should have imposed more rigid measures, such as requiring Ms. Ohlander to surrender both her and Julia's passports to the clerk of court prior to receiving physical custody of Julia, or leaving custody with Mr. Larson pending the petition's outcome. *See Currier v. Currier*, 845 F. Supp. 916, 923 (D. N.H. 1994) (district court requiring petitioner surrender her and her children's passport to the court's clerk pending appeal). However, if such measures are not imposed, or if they fail, the court is not thereby released of its duty to consider the merits of the parties' cases when considering how best to enforce compliance. In sum, there is no doubt Ms. Ohlander's actions were contemptible, for she brazenly thumbed her

nose at the United States district court's order not to remove Julia from Utah; nevertheless, such conduct does not warrant a court denying a motion to dismiss solely on that ground.

In sum, we hold it necessary to dismiss this action. Mr. Larson does not suffer legal prejudice from such a dismissal, and the balance of relevant factors, along with the intent of the Convention, weigh in favor of dismissal.

We **REVERSE** the district court and **REMAND** with instructions to dismiss the petition without prejudice.

95-4114, 96-4080, *Ohlander v. Larson*

Murphy, Circuit Judge, dissenting

I concur in the majority's conclusion that the district court erred in failing to consider the governing legal standards and relevant facts relating to Ms. Ohlander's Fed. R. Civ. P. 41 motion to dismiss. Rather than resolve the Rule 41 issue ourselves, however, we should remand this case to the district court for an appropriate Rule 41 evaluation and an accompanying adequate development of the record in light of the new law established by this court's opinion. Therefore, I dissent from the majority's resolution of the motion to dismiss on the merits and its failure to remand.

*A. Rule 41(a)(2) Factors*

The trial court denied Ms. Ohlander's Fed. R. Civ. P. 41(a)(2) motion to dismiss for the sole reason that Ms. Ohlander was in contempt of court. In doing so, the court failed to consider the appropriate legal standards under Rule 41(a)(2). Although the trial court could properly consider Ms. Ohlander's contemptuous conduct, it was also required to evaluate other governing legal criteria. *McNickle v. Bankers Life & Casualty Co.*, 888 F.2d 678, 680 (10th Cir. 1989) (noting trial court errs when it fails to consider applicable legal standard or facts on which exercise of discretionary judgment is based). Its failure to do so requires reversal.

Ironically, the majority has reversed the district court for refusing to grant Ms. Ohlander's motion for the *sole* reason that she was in contempt of court, yet ruled *de novo* that Ms. Ohlander's motion should be granted for the *sole* reason that Mr. Larson initiated his own Hague Convention proceedings.[1] The district court was required to evaluate fairly all Rule 41 factors; we should similarly be bound. An adequate record on remand, however, would be necessary.

In evaluating a Rule 41(a)(2) motion to dismiss, a court must consider the prejudice to the non-moving party. *Clark v. Tansy*, 13 F.3d 1407, 1411 (10th Cir. 1993) (quoting *Barber v. General Elec. Co.*, 648 F.2d 1272, 1275 (10th Cir. 1981)). In *Tansy*, we adopted the following factors to assess "legal prejudice" to the opposing party: (1) the non-moving party's effort and expense of preparation for trial; (2) the moving party's delay and lack of diligence in prosecuting the action; and (3) insufficient explanation for the need to allow a dismissal. *Clark*, 13 F.3d at 1411 (quoting *Huskey v. National Liquid Blasting Corp.*, 1987 WL 276128, *1 (D. Kan. Aug. 7, 1987) (quoting *United States v. Outboard Marine Corp.*, 789 F.2d 497, 502 (7th Cir.) *cert. denied*, 479 U.S. 961 (1986))). This list

---

[1] As discussed on pages 3-4, the only other factor the majority articulates in favor of Ms. Ohlander's motion is its conclusory statement, lacking support in the record, that there was no excessive delay and lack of diligence on Ms. Ohlander's part in bringing her motion. Stripped of this unsupported assertion, it is evident that the majority's outcome rests only on the desire to avoid a potentially conflicting decision from another sovereign state.

is not exhaustive; a court may also consider other relevant factors in its Rule 41(a)(2) analysis. *Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 358 (10th Cir. 1996) (noting above factors are not exclusive, but instead are guides for district court).

The record does not address Mr. Larson's effort and expense of preparation for trial. Ms. Ohlander did not file her motion to dismiss, however, until Mr. Larson had filed a request for a final pretrial conference, suggesting that Mr. Larson had completed substantial trial preparation. If so, this would weigh against granting a motion to dismiss.

As to the second *Tansy* factor, the majority states that "the record shows Ms. Ohlander's counsel was actively and diligently moving forward with the case regardless of Ms. Ohlander's absence." Maj. Op. at 16-17. A review of the docket sheet, the only record of Ms. Ohlander's litigation activity, undermines this assertion. The docket reveals that Ms. Ohlander waited almost a year after initiating her action before filing her motion to dismiss. During this time she did virtually nothing to affirmatively move her case along; instead, she merely responded through counsel to Mr. Larson's efforts to obtain a contempt order and the return of Julia to Utah. Thus, if anything, the limited record before us supports the conclusion that Ms. Ohlander did not diligently prosecute this action. Indeed, her conduct in absconding with Julia in violation of the court order belies

a motivation to move her case forward. A remand would be useful on this point to explore whether she or her counsel made any efforts to prosecute the case that do not now appear in the record.

The majority also opines that because Ms. Ohlander filed her motion to dismiss after Mr. Larson filed his application with the United States Central Authority, "the timing of Ms. Ohlander's motion could not constitute excessive delay sufficient to legally prejudice Mr. Larson." Maj. Op. at 16. The logic of this statement is unclear. The filing of her motion in no way reflects her pre-filing diligence in prosecuting her case once she removed the child from the United States in violation of the district court's order. Indeed, Mr. Larson's application with the United States Central Authority is absolutely irrelevant to an evaluation of whether Ms. Ohlander diligently pursued her separately filed action before the United States District Court.

Finally, Ms. Ohlander did not provide a sufficient explanation of her need for dismissal. Ms. Ohlander gave three reasons for her Rule 41 motion, all derived from her fleeing with the child in violation of the district court's order and her defiance of the district court's subsequent order that the child be returned to Utah. None of Ms. Ohlander's reasons warrant dismissal of her action. The majority forthrightly acknowledges that granting Ms. Ohlander's motion based on her first two reasons (that her petition was moot, and the child was no longer in

-4-

the state of Utah) would create a perverse incentive for others to use United States courts to obtain physical control of their children and then unlawfully flee the United States. Thus, these reasons concededly provide no support for Ms. Ohlander's motion.

The majority concludes that Ms. Ohlander's third reason for dismissal, Mr. Larson's application to the Swedish Authority and his subsequent petition to the Swedish court, "provided the most persuasive reason to dismiss the United States district court proceeding." Maj. Op. at 18. Punishing Mr. Larson for enlisting the aid of the only sovereignty with physical control of his child, however, ignores the practical and emotional dilemma with which Mr. Larson was faced. Litigating this matter in the United States could not provide Mr. Larson what he sought most: contact with his child. With his child in Sweden, albeit unlawfully, Mr. Larson had no real alternative but to seek Swedish assistance.[2] Otherwise, he was faced with the devastating potential of a lingering loss of contact with his daughter. In addition, Mr. Larson had strategic litigation reasons for filing in Sweden when he did. The Hague Convention allows a parent who has fled even unlawfully with a child to assert a settled environment defense to a petition for

---

[2]As noted on pages 7-9, his filing in Sweden was also mandated by the United States enabling legislation for the Hague Convention, the International Child Abduction Remedies Act, which provides jurisdiction only to courts "in the place where the child is located at the time the petition is filed." 42 U.S.C. § 11603(b).

return of a child if the petition is not filed within one year from the date the child is taken. Hague Convention on the Civil Aspects of International Child Abduction, Dec. 23, 1981, art. 12, 51 Fed. Reg. 10494, 10499 (1986). Mr. Larson, therefore, had only one year to file if he wanted to prevent Ms. Ohlander from creating this defense by her unlawful flight. Under these circumstances, Mr. Larson's filing in Sweden does not in any way compel the dismissal of the United States action.

*B. Additional Factors*

*1. Appropriate Forum*

The majority maintains that Sweden was "the jurisdiction where the claims and defenses of both Ms. Ohlander and Mr. Larson could be more fairly adjudicated." Maj. Op. at 22. Specifically, the majority bases its preference for a Swedish adjudication on the presence of all the parties, including Julia, in Sweden, and its view that only in Sweden could Ms. Ohlander assert a "settled environment" defense.

Placing weight on the presence of all parties in the Swedish proceedings is inappropriate. The precipitating reason for all parties' participation in the Swedish action was Ms. Ohlander's unlawful flight from the United States with Julia. Had Ms. Ohlander obeyed the district court's order and remained in Utah with Julia during the pendency of the United States proceedings, all parties would

have been physically present for the United States proceedings. Instead, Ms. Ohlander chose to participate through counsel rather than to personally attend the United States trial. Her unlawful absence from the United States trial should not accrue to her benefit.

The majority's view that the settled environment defense is available only in Sweden is similarly flawed. Article 12 of the Hague Convention creates the settled environment defense only when "a period of less than one year has elapsed from the date of the wrongful removal or retention . . . ." Hague Convention, art. 12, 51 Fed. Reg. at 10499. Because Mr. Larson filed in Sweden within one year of Ms. Ohlander's removal of Julia, the defense was unavailable to Ms. Ohlander in the Swedish action. Similarly, if Mr. Larson had complied with the majority's ruling and filed in the United States within one year of Julia's removal, the defense would have been unavailable in the United States action. Furthermore, the majority erroneously asserts that denying Ms. Ohlander's motion to dismiss renders the settled environment defense unavailable to her in the Utah action. The availability of the settled environment defense hinges on the filing and timing of Mr. Larson's own petition, not on whether Ms. Ohlander's motion to dismiss is granted or denied.

### 2.    Hague Convention Procedures

The majority also states that Mr. Larson "*chose* to assert his claims in a court of another jurisdiction," Maj. Op. at 19 (emphasis added), and that he would have been better served by filing a cross-petition in the United States District Court.  Mr. Larson did not, however, have a choice where to file his petition once Ms. Ohlander took Julia to Sweden.  Section 11603(b) of the International Child Abduction Remedies Act, the enabling legislation for the Hague Convention, provides:

> Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction *in the place where the child is located at the time the petition is filed*.

42 U.S.C. § 11603(b) (emphasis added).  At the time Mr. Larson filed his petition in January 1995, Julia was in Sweden, not Utah.  At that point in time, the enabling legislation for the Hague Convention itself compelled Mr. Larson to file in Sweden because of Julia's presence there; it was the only nation with jurisdiction.

Mr. Larson was careful to limit his Swedish petition to the issue of Ms. Ohlander's taking of Julia in February 1994.  The petition specifically informed the Swedish court of the Hague Convention proceedings pending in the United

States District Court for the District of Utah, and that Mr. Larson was not intending to confer jurisdiction on the Swedish courts over the Hague Convention matters that were properly before the United States District Court. Mr. Larson also requested that the Swedish courts await the district court's ruling on those matters.

After the United States District Court entered its findings and conclusions, the United States Central Authority notified Sweden of the United States ruling and asked that the Swedish court limit its decision to the issue presented in Mr. Larson's petition. In a memo to Sweden's Central Authority, a representative of the Office of Children's Issues stated:

> The only unresolved Hague Convention issue for the Swedish courts to rule upon is the final resolution of Ms. Ohlander's most recent removal of the child from Utah on February 1, 1994. There is no doubt that Sweden is the "requested State" for the adjudication of that issue, and that the Swedish courts have exclusive jurisdiction to make a final resolution of that matter in accordance with the provisions of the Hague Convention. Regarding that removal, the U.S. Court, as a judicial authority of the "requesting State," has made findings in accordance with Article 15 of the Convention, namely that the removal was in breach of Mr. Larson's actually-exercised rights of custody under Utah law, and that Mr. Larson neither consented to nor acquiesced in the removal. These findings, coupled with the judicially established fact that the child was habitually resident in Utah in November 1993, where she continued to live until the date of said removal, clearly establish that this was a new wrongful removal within the meaning of Article 3 of the Convention.

Memorandum from Mr. James L. Schuler, Office of Children's Issues, United States Central Authority, to Central Authority of Sweden 2 (August 14, 1995).

The Hague Convention procedures thus not only required Mr. Larson to file in Sweden, where the child was located, but also allowed him to limit his petition to the one issue not before the United States District Court. By following Hague Convention procedures and limiting his Swedish petition, he did not voluntarily create the potential for conflicting international decisions.

### 3. Conflicting Decisions

The majority's desire to avoid conflicting decisions of sovereign states is a worthy goal. Nevertheless, no law, national or international, can be expected to resolve such conflicts in all cases, particularly cases involving a mother and father warring over their offspring. To base the outcome of this case on a *potentially* conflicting decision of Sweden is to unjustifiably abandon the rights of a United States citizen in the name of international comity. It is indeed ironic to do so when the substantive decision of the district court was not in conflict with any extant Swedish decision at the time of its promulgation. To the contrary, the Swedish decision favorable to Ms. Ohlander created the conflict in the decisions of two sovereign nations. The Swedish decision was issued after and in conflict with the district court decision.[3] *See United States ex rel. Saroop v.*

---

[3]Before the Sweden Supreme Administrative Court created the international conflict in decisions, the United States Central Authority entreated the Swedish courts:

It is only through [ ] cooperation that the Hague Convention can successfully resolve these international conflicts over children, as it was designed to do. The

*Garcia*, No. 96-7196, 1997 WL 127158, at *4 (3d Cir. Mar. 21, 1997) ("As a condition to honoring a foreign country's judicial decrees, the Court also requires reciprocity on the part of the foreign nation."); *Remington Rand Corporation-Delaware v. Business Systems Inc.*, 830 F.2d 1260, 1273 (3d Cir. 1987) (noting comity must be "two-way street" and reciprocity is consideration of "extreme importance").

Because no Hague Convention decisions had been rendered by any Swedish courts at the time the district court ruled on the motion to dismiss, it is furthermore inappropriate for this court to base its ruling on the conflict in decisions. *See* Maj. Op. at 25 ("By failing to dismiss the United States action we

_____

present case offers a perfect illustration: A Hague Convention judgment from Sweden which respects the prior Hague Convention judgment from the U.S. will put an end to the international jurisdictional competition between these States and will allow for a final and long-overdue custody adjudication, thus providing for the best interests of the child and finally allowing her to develop stable, secure family relationships. On the other hand, a Hague Convention judgment from Sweden which disregards the prior Hague Convention judgment from the United States would only perpetuate and escalate the already intolerable conflict, as the parties would then possess contradictory Hague Convention judgments in their favor from their respective States, which would be the most unstable and insecure situation imaginable. Such a situation would guarantee that whichever parent has possession of the child would not dare allow the other parent access to the child, and the parent without possession of the child would have no option but to resort to force in order to have any contact with the child.

Memo from Mr. James L. Schuler, Office of Children's Issues, to Central Authority of Sweden 2-3 (August 14, 1995).

would allow to stand two conflicting decisions regarding Julia's state of habitual residence . . . ."). Instead, our review should be limited to those factors before the district court at the time it ruled. New factual matters should only be considered by the district court in the exercise of its discretion on remand.

### 4. Consideration of Ms. Ohlander's Contempt

The district court's consideration of Ms. Ohlander's contempt of court was entirely appropriate. Although the district court considered this to the exclusion of other relevant criteria, its actions in doing so are understandable, if not correct. Ms. Ohlander availed herself of the services of the district court to obtain temporary custody of the child. She then fled this country in direct violation of the very order by which she obtained physical control of the child. Her conduct can neither be ignored nor rewarded. Although this should not control the district court's decision to the exclusion of other governing factors, it may fairly be given significant weight in the court's overall analysis.

### C. Treatment of Larson's Defenses as Counterclaims

The majority rejects Mr. Larson's request that his response to Ms. Ohlander's petition be treated as a counterclaim or, for Hague Convention purposes, a petition.[4] Maj. Op. at 18-19. Rule 8(c) of the Federal Rules of Civil

---

[4]Rule 41(a)(2) provides: "If a counterclaim has been pleaded by a defendant prior to the service upon the defendant of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the

Procedure allows a court to treat a defense as a counterclaim, "if justice so requires." In Mr. Larson's response to Ms Ohlander's petition, he alleges that the United States was, and at all times had been, the country of Julia's habitual residence as defined under the Hague Convention, and prays for his daughter's return to his physical care and control. The essence of Mr. Larson's response is generally equivalent to the relief he would request were he to file his own formal Hague Convention petition.[5] Treating Mr. Larson's response as a counterclaim would place the *respondent's* removal of the child and any proper settled environment defense before the district court, thus eradicating the majority's concern that such issues could not be decided without Mr. Larson's own petition

counterclaim can remain pending for independent adjudication by the court." Fed. R. Civ. P. 41(a)(2).

[5] For example, Ms. Ohlander's petition before the district court requested the following relief:

> Petitioner requests that the child be immediately returned to her custody, and that she be permitted to return to Sweden, which is the country of habitual residence of both Petitioner and the child, and that temporarily, pending further hearing on this Petition, she be permitted to retain custody of the child within the jurisdiction of this Court pending this Court's final determination.

Petition for Return of Child to Petitioner at 4. Mr. Larson alleged substantially the same matters in his defenses. Justice would not be served by requiring Mr. Larson to file a separate pleading, formally designated as a counterclaim, alleging the very matters already contained in his defenses. To do so honors form over substance in an emotionally charged setting where a parent seeks to reestablish contact with his child.

in the district court.  *See* Hague Convention, arts. 3 & 12, 51 Fed. Reg. at 10,498-10,499; 42 U.S.C. § 11603(b), (e).  In light of Rule 41(a)(2) factors and the Hague Convention's objective of protecting children from the law of "grab and run," (Maj. Op. at 5-6), the interests of justice are indeed served by construing Mr. Larson's response as a counterclaim.

*D. Conclusion*

The majority has reversed the district court for refusing to dismiss Ms. Ohlander's petition on the basis of her contempt of court and instead has ruled *de novo* that Ms. Ohlander's motion should have been granted.  In doing so, the majority has considered facts not before the district court at the time it ruled.  It has further allowed those very facts (*i.e.,* conflicting international decisions) to control the outcome of this appeal, to the exclusion of other governing criteria.

This case should be remanded to the district court for full consideration of Rule 41(a)(2) criteria.[6]  The trial court failed to consider critical factors governing Ms. Ohlander's motion.  Consequently, the record of such factors is

---

[6]It is incongruous for this court to say that Rule 41 motions are addressed to the sound discretion of the trial court and yet, rather than remand, rule *de novo* that trial court discretion as a matter of law could only result in dismissal. Beyond this incongruity, ruling *de novo* that Ms. Ohlander's Rule 41 motion should be granted as a matter of law assumes that the district court's discretionary ruling upon remand would be denial of the motion, rather than granting the motion or even staying the action, an alternative expressly contemplated by the Hague Convention.  Hague Convention, art. 12, 51 Fed. Reg. at 10499.

incomplete. An appellate court may decide a matter rather than remand if the underlying facts are undisputed and judicial economy and efficiency would be furthered thereby. *Park County Resource Council, Inc. v. United States Dept. of Agric.*, 817 F.2d 609, 617-18 (10th Cir. 1987), *overruled on other grounds by Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir. 1992). Such is not the case here. A remand is required when the record needs further development. *See Mobley v. McCormick*, 40 F.3d 337, 341 (10th Cir. 1994) (remanding when record inadequate to evaluate trial court's consideration of required criteria).

In this case, the record is simply insufficient to enable this court to apply adequately the legal criteria governing Rule 41(a)(2) motions to dismiss. In addition, the majority has set forth a set of novel factors it believes must be evaluated in this case. The trial court had absolutely no notice that consideration of such factors would be required in this case. If the majority is going to require a trial court to consider novel factors, that court should be given an opportunity to exercise its discretion, address those factors on remand and develop a meaningful record. At that time, the district court could carefully consider the mandate of the Convention's Article 12 which provides that a forum may *stay* or *dismiss* a Hague Convention proceeding when the subject child has been taken to another State. Hague Convention, art. 12, 51 Fed. Reg. at 10499.

In the context of this case, an appellate ruling as a matter of law is inappropriate. I would reverse and remand for further proceedings on Ms. Ohlander's Rule 41 motion to dismiss.