**FILED**

**U.S. Bankruptcy Appellate Panel
of the Tenth Circuit**

**June 18, 2019**

**Blaine F. Bates
Clerk**

NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

_____

In re GEORGE VELASQUEZ,

    Debtor.

_____

GEORGE VELASQUEZ,

    Appellant,

v.

YVETTE GONZALES, Chapter 7 Trustee,
& LOS ALAMOS NATIONAL BANK,

    Appellees.

BAP No. NM-18-076

Bankr. No. 12-10670
Chapter 7

OPINION*

_____

Appeal from the United States Bankruptcy Court
for the District of New Mexico

_____

Submitted on the briefs.**

_____

Before **SOMERS**, **MOSIER**, and **MARKER**,[1] Bankruptcy Judges.

_____

*     This unpublished opinion may be cited for its persuasive value, but is not precedential, except under the doctrines of law of the case, claim preclusion, and issue preclusion. 10th Cir. BAP L.R. 8026-6.

**     After examining the briefs and appellate record, the Court has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed. R. Bankr. P. 8019(b). The case is therefore submitted without oral argument.

[1]     Joel T. Marker, U.S. Bankruptcy Judge, United States Bankruptcy Court for the District of Utah, sitting by designation.

_____

**MOSIER**, Bankruptcy Judge.

Successfully challenging a trustee's decision to settle litigation is a difficult task. To do so, the party opposing the settlement must establish that the settlement falls below the lowest point in the range of reasonableness.[2] The Appellant did not make that showing, and we therefore affirm the Bankruptcy Court's decision.

## I.   FACTUAL AND PROCEDURAL HISTORY

**A.   The Business Loan**

Debtor George Velasquez owned and operated a corporation called Professional Business Assistants, Inc. (PBA), which borrowed $396,000 from Los Alamos National Bank (LANB) in August 2006 (Business Loan). The Business Loan had a thirty-year term and a variable interest rate. LANB secured the Business Loan with a mortgage against PBA's commercial building in Santa Fe, New Mexico. The Debtor also personally guaranteed the Business Loan.

PBA defaulted on the Business Loan but LANB agreed to renew the note, re-amortizing principal and interest, though retaining the same maturity date. After PBA defaulted on the first renewal, LANB and PBA executed a second renewal note in June 2010, which provided PBA would make one balloon payment of the remaining loan balance on December 1, 2010 (June Renewal). PBA defaulted on the June Renewal's balloon payment, resulting in a final renewal, which extended the maturity date until

---

[2]    *Rich Dad Operating Co.v. Zubrod (In re Rich Global, LLC)*, 652 F. App'x 625, 631 (10th Cir. 2016) (unpublished).

April 1, 2011 (December Renewal). On March 1, 2011, the Debtor and PBA signed a one-month promissory note for $13,846.14, due April 1, 2011 (Short Term Loan).

## B.    The Personal Loan

The Debtor borrowed $273,000 from LANB in March 2007 (Personal Loan). LANB secured the Personal Loan with a mortgage against the Debtor's residence in Santa Fe, New Mexico. The Debtor defaulted on the Personal Loan in March 2010. The Debtor and LANB executed a modification agreement, re-amortizing the principal balance of, and accrued interest on, the Personal Loan.

## C.    LANB's Collection Actions and the Debtor's Bankruptcy

By the spring of 2011, the Debtor and PBA had defaulted on the Business, Personal, and Short Term Loans and all subsequent renewals. Accordingly, LANB sent a notice of default in April 2011. The Debtor held six personal bank accounts with LANB, and PBA held two business bank accounts. The deposit account agreements authorized LANB to freeze and offset account balances against outstanding obligations. In early June 2011, LANB froze the Debtor's and PBA's bank accounts and offset $3,840.62 from those bank account balances on account of the outstanding obligations.[3]

LANB filed a state court foreclosure action against PBA and the Santa Fe commercial property to recover on the Business and Short Term Loans in July 2011. The

---

[3]    LANB initially offset $5,570.13, but returned $1,729.51 upon discovering it was drafted from a joint account held by the Debtor and his daughter.

3

Debtor and PBA paid off the balance of the Business and Short Term Loans in November 2011, and LANB dismissed the foreclosure action.

LANB also filed a state court foreclosure action against the Debtor and his Santa Fe residence to recover on the Personal Loan in August 2011. The Debtor filed his bankruptcy case on February 24, 2012, staying the foreclosure. The Debtor received a discharge on June 6, 2012, and the case closed later that month on June 18. The Debtor reopened the case nine days later on June 27, alleging LANB had violated the automatic stay. While the case was reopened, the Debtor amended his schedules to list his interest in PBA, valuing it at $1, and to list a claim against LANB for wrongful foreclosure, also valuing it at $1. The state court entered a final foreclosure judgment in August 2016, and the foreclosure sale of the Debtor's home occurred in September 2016. LANB filed a proof of claim for approximately $164,259 on account of the deficiency resulting from that sale.

In February 2017, the Debtor filed a state court lawsuit against LANB alleging thirteen claims relating to the Business Loan and setoff. The Debtor alleged that LANB had breached the terms of the Business Loan and renewals[4] and that the offsets from his bank accounts constituted conversion.

In the meantime, the Debtor's bankruptcy case closed and reopened three times, the last of which occurred in March 2017. Yvette Gonzales was appointed as Chapter 7

---

[4]     The Debtor claimed the purpose of the modification was to extend the maturity date and that he did not learn of LANB's misrepresentations until January 2016. *Exhibit D, Affidavit of George Velasquez* at 1-4, *in* Appellant's App. at 163-66.

trustee (Trustee). The Debtor amended his schedules to value his claims against LANB at $6,748. He also amended his Schedule C to exempt any recovery on the claims against LANB.[5] The Trustee investigated the lawsuit against LANB and the parties began settlement negotiations.

## D.    The Motion to Approve Compromise

The Trustee filed the *Motion to Approve Compromise of Controversy* on December 11, 2017 (Motion to Compromise).[6] The Trustee and LANB proposed to settle the estate's claims against LANB in exchange for payment of $10,000 to the estate and waiver of LANB's $164,259 proof of claim. The Debtor filed his *Objection to Motion to Approve Compromise of Controversy* (Objection) on January 2, 2018.[7] At a preliminary hearing on April 9, 2018, the Bankruptcy Court set a discovery deadline of June 4, 2018, and scheduled a final hearing on the Motion to Compromise for June 20, 2018.

LANB and the Debtor agreed to an informal extension of discovery deadlines until June 8, 2018. After receiving LANB's discovery responses on June 8, the Debtor filed a motion to continue the hearing (Motion to Continue), arguing he needed an additional two weeks to review the responses. LANB objected to the Motion to Continue and the Bankruptcy Court held a hearing to address the matter on June 18, 2018. The Bankruptcy

---

[5]    The Debtor stipulated to the denial of his claim of exemption of any award for the claims against LANB in September 2017.
[6]    Appellant's App. at 135.
[7]    Appellant's App. at 142.

Court denied the Motion to Continue the same day, requiring the Debtor to tender his witness list by June 18 at 5:00 pm and his exhibit list by June 19 at 5:00 pm.

The Bankruptcy Court proceeded with the hearing on the Motion to Compromise on June 20, as scheduled. At that hearing the Debtor testified that he was unaware the maturity date of the Business Loan had been reduced by the renewals and he suggested that LANB had fraudulently foreclosed based on altered notes. He also testified that he had suffered damages in the form of lost business profits as a result of the account freeze and offset, estimating his damages between $15,000,000 and $30,000,000.

The Trustee testified that, after evaluating the Debtor's claims against LANB, she believed the likelihood of success on the claims was "slim to none."[8] Furthermore, she did not believe the Debtor's claim that LANB had misrepresented the maturity date was credible or that his damage claim could be supported. Finally, the Trustee testified that she believed the compromise to be in the best interest of creditors because it removed the largest unsecured claim from the estate, allowing remaining creditors to receive a distribution of over fifty percent.

The Bankruptcy Court made its findings of fact and conclusions of law on the record at a July 6, 2018 hearing.[9] The Bankruptcy Court did not find the Debtor's testimony credible, observing that because the maturity dates were "not buried in the fine print, but [were] set out very plainly at the top of the note," the Debtor, a sophisticated

---

[8] *Tr. June 20, 2018 Hearing* at 7, *in* Appellant's App. at 207.
[9] *Tr. July 6, 2018 Hearing*, *in* Appellant's App. at 228.

businessman, should have had knowledge of them.[10] Furthermore, the Bankruptcy Court

took issue with the Debtor's $6,748 scheduled valuation of his claims against LANB

compared to his testimony that he suffered up to $30,000,000 in damages.

The Bankruptcy Court applied the four factors from *Kopp v. All American Life*

*Insurance Company (In re Kopexa Realty Venture Company)*[11]—which are widely

referred to in this Circuit as the *Kopexa* factors—and concluded that (1) the Trustee

would be unlikely to prevail on the claims; (2) a resulting judgment might only net

$25,000 or so for creditors; (3) litigation would require counsel and expert witnesses,

making pursuit of the claims cost-prohibitive; and (4) creditors had "more to gain with

greater certainty through the settlement."[12] The Bankruptcy Court entered the *Order*

*Granting Trustee's Motion to Approve Compromise of Controversy* on July 6, 2018

(Order Approving Compromise).[13]

## II.     JURISDICTION AND STANDARD OF REVIEW

"With the consent of the parties, this Court has jurisdiction to hear timely-filed

appeals from 'final judgments, orders, and decrees' of bankruptcy courts within the Tenth

Circuit."[14] An order granting a motion to approve a compromise of claims is final for

---

[10]     *Tr. July 6, 2018 Hearing* at 9-10, *in* Appellant's App. at 231.
[11]     213 B.R. 1020 (10th Cir. BAP 1997).
[12]     *Tr. July 6, 2018 Hearing* at 19, *in* Appellant's App. at 233.
[13]     Appellant's App. at 199.
[14]     *Straight v. Wyo. Dep't of Transp. (In re Straight)*, 248 B.R. 403, 409 (10th Cir. BAP 2000) (first quoting 28 U.S.C. § 158(a)(1), and then citing 28 U.S.C. § 158(b)(1), (c)(1) and Fed. R. Bankr. P. 8002).

purposes of 28 U.S.C. § 158(a)(3).[15] None of the parties in this case elected for this appeal to be heard by the United States District Court for the District of New Mexico pursuant to 28 U.S.C. § 158(c). Accordingly, this Court has jurisdiction over this appeal.

We review a bankruptcy court's approval of a settlement agreement brought pursuant to Federal Rule of Bankruptcy Procedure Rule 9019[16] for an abuse of discretion.[17] "Under the abuse of discretion standard[,] a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."[18] An abuse of discretion occurs when a trial court "makes an 'arbitrary, capricious or whimsical,' or 'manifestly unreasonable judgment.'"[19] "A clear example of an abuse of discretion exists where the trial court fails to consider the applicable legal standard or the facts upon which the exercise of its discretionary judgment is based."[20]

We review a bankruptcy court's findings of fact for clear error. "A factual finding is 'clearly erroneous' when 'it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a

---

[15] *See Korngold v. Loyd (In re S. Med. Arts Cos.)*, 343 B.R. 250, 254 (10th Cir. BAP 2006).

[16] All references to Rule or Rules are to the Federal Rules of Bankruptcy Procedure unless otherwise indicated.

[17] *In re S. Med. Arts Cos.*, 343 B.R. at 256.

[18] *Arenas v. U.S. Tr. (In re Arenas)*, 535 B.R. 845, 849 (10th Cir. BAP 2015) (quoting *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994)).

[19] *Id.* (quoting *Moothart*, 21 F.3d at 1504-05).

[20] *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1191 (10th Cir. 2018) (quoting *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997)).

mistake has been made.'"[21] But if the bankruptcy court's "factual findings are premised on improper legal standards or on proper ones improperly applied, they are not entitled to the protection of the clearly erroneous standard, but are subject to *de novo* review."[22]

We review questions of law *de novo*, which "requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision."[23]

## III.   DISCUSSION

### A.   The Applicable Law

Rule 9019(a) governs approval of a compromise or settlement. But that rule only provides the procedure used to obtain that approval; it does not contain the standard by which courts evaluate compromises or settlements. Nor does the Bankruptcy Code offer any statutory guidance on that front. The development of this area of the law has been left to the courts.

The Tenth Circuit Court of Appeals has not yet issued a published decision addressing what standard a Rule 9019 settlement must achieve before it can be approved. Even though there is no controlling circuit law on the subject, the Tenth Circuit has stated

---

[21]     *LTF Real Estate Co. v. Expert S. Tulsa, LLC (In re Expert S. Tulsa, LLC)*, 522 B.R. 634, 643 (10th Cir. BAP 2014) (quoting *Las Vegas Ice & Cold Storage Co. v. Far W. Bank)*, 893 F.2d 1182, 1185 (10th Cir. 1990)).

[22]     *Minerals Techs., Inc. v. Novinda Corp. (In re Novinda Corp.)*, 585 B.R. 145, 152 (10th Cir. BAP 2018) (quoting *Osborn v. Durant Bank & Tr. Co. (In re Osborn)*, 24 F.3d 1199, 1203 (10th Cir. 1994), *abrogated in part on other grounds by Eastman v. Union Pac. R.R.*, 493 F.3d 1151 (10th Cir. 2007)).

[23]     *In re Expert S. Tulsa, LLC*, 522 B.R. at 643 (citing *Salve Regina Coll. v. Russell)*, 499 U.S. 225, 238 (1991)).

in a handful of unpublished decisions that "[a] court's general charge is to determine whether the settlement is fair and equitable and in the best interests of the estate."[24] Put another way, the court should "review the issues and determine whether the settlement falls below the lowest point in the range of reasonableness."[25] In reaching this determination, a court need not conduct a mini-trial or decide the numerous questions of law and fact,[26] but its decision to approve a settlement "must be an informed one based upon an objective evaluation of developed facts."[27]

To fulfill the duties articulated by the Tenth Circuit, bankruptcy courts in this Circuit invariably, if not inveterately, review Rule 9019 settlements through the lens of the *Kopexa* factors. But there is no binding precedent that requires analyses of such settlements to use those factors. The Tenth Circuit has never endorsed them in a published decision, likely because parties have not presented the factors' applicability as

---

[24] *Rich Dad Operating Co. v. Zubrod (In re Rich Global, LLC)*, 652 F. App'x 625, 631 (10th Cir. 2016) (unpublished) (citing *Official Comm. of Unsecured Creditors of W. Pac. Airlines, Inc. v. W. Pac. Airlines, Inc. (In re W. Pac. Airlines, Inc.)*, 219 B.R. 575, 579 (D. Colo. 1998)). Under the Tenth Circuit Rules, unpublished decisions, such as *In re Rich Global, LLC*, "are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1(A).

[25] *In re Rich Global, LLC*, 652 F. App'x at 631 (quoting 8 *Norton Bankruptcy Law & Practice* § 167:2 (3d ed. 2011)).

[26] *E.g.*, *In re Brutsche*, 500 B.R. 62, 71 (Bankr. D.N.M. 2013).

[27] *Korngold v. Loyd (In re S. Med. Arts Cos.)*, 343 B.R. 250, 256 (10th Cir. BAP 2006) (quoting *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir. 1989)); *see also Armstrong v. Rushton (In re Armstrong)*, 285 B.R. 344, 2002 WL 471332, at *2 (10th Cir. BAP Mar. 28 2002) (unpublished) ("There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968))), *aff'd*, 99 F. App'x 210 (10th Cir. 2004) (unpublished).

an issue on appeal.[28] Even our own prior decisions leave some uncertainty regarding whether the *Kopexa* factors constitute an exhaustive list of criteria. *Kopexa* itself merely stated that it is appropriate to consider the four now well-known factors in evaluating settlements; it did not mandate their application or exclude others.[29] But in 2006 this Court issued a decision that characterized *Kopexa* as having "adopted" the four-factor test "for evaluating the factual circumstances of a compromise."[30]

We have not revisited the issue in a published decision since that time, but in a series of unpublished decisions the BAP incrementally advanced towards mandatory application of the *Kopexa* factors,[31] finally reaching that position in *Isho v. Loveridge (In re Isho).*[32] In that case, we held that bankruptcy courts must consider the *Kopexa* factors in reviewing proposed settlements, though there was no discussion of whether additional

---

[28]     *See, e.g.*, *In re Rich Global, LLC*, 652 F. App'x at 631 ("The parties do not argue that the bankruptcy court erred in identifying [the *Kopexa* factors] as the appropriate factors, and so we assume without deciding that they are."). In fact, the only published Tenth Circuit opinion to cite *Kopexa*, *Scott v. King (In re Amerson)*, 839 F.3d 1290 (10th Cir. 2016), did not have occasion to address whether the *Kopexa* factors are the correct standard by which to evaluate Rule 9019 settlements because the appellant did not raise the issue. *See In re Amerson*, 839 F.3d at 1298.

[29]     *See Kopp v. All American Life Insurance Company (In re Kopexa Realty Venture Company)*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997).

[30]     *In re S. Med. Arts Cos.*, 343 B.R. at 256.

[31]     *See Allen v. Loveridge (In re Log Furniture, Inc.)*, 356 B.R. 787, 2007 WL 496784, at *3 (10th Cir. BAP Feb. 16, 2007) (unpublished) (stating that the "[f]actors to consider" in approving a settlement agreement are the *Kopexa* factors), *aff'd* 257 F. App'x 101 (10th Cir. 2007) (unpublished); *Lewis v. McCallum (In re Lewis)*, 378 B.R. 418, 2007 WL 2189343, at *4 (10th Cir. BAP July 31, 2007) (repeating the "adopted" language of *Southern Medical Arts*).

[32]     498 B.R. 391, 2013 WL 1386208 (10th Cir. BAP Apr. 5, 2013) (unpublished).

11

factors could apply.[33] Subsequent decisions have reached the same conclusion.[34] Although there is no controlling circuit law requiring the application of the *Kopexa* factors on the one hand or precluding consideration of supernumerary factors on the other, we conclude that using the *Kopexa* factors in evaluating Rule 9019 settlements is consistent with the standard stated by the Tenth Circuit in *Rich Global*.

As stated previously, the *Kopexa* factors are: "[1] the probable success of the underlying litigation on the merits, [2] the possible difficulty in collection of a judgment, [3] the complexity and expense of the litigation, and [4] the interests of creditors in deference to their reasonable views."[35] "[T]he court need not resolve all of these issues, but must only identify them 'so that the reasonableness of the settlement may be evaluated.'"[36]

## B.    Application of Controlling Law

The Bankruptcy Court applied the *Kopexa* factors, concluding that they weighed in favor of approving the settlement agreement. After reviewing the Order Approving

---

[33]    *Id.* at *3. In fact, the *Isho* panel did not have reason to address whether the *Kopexa* factors had been satisfied; it summarily affirmed the bankruptcy court's approval of the settlement because the appellant failed to provide an adequate record for review on that issue. *Id.* at *4.

[34]    *See Amerson v. King (In re Amerson)*, No. CO-14-045, 2015 WL 5162763, at *7 (10th Cir. BAP Sept. 2, 2015) (unpublished) ("The Tenth Circuit standard for determining whether a settlement in a bankruptcy case should be approved is a four-part test articulated by this Court in [*Kopexa*]."), *aff'd sub nom. Scott v. King (In re Amerson)*, 839 F.3d 1290 (10th Cir. 2016); *Brumfiel v. Lewis (In re Brumfiel)*, No. CO-15-014, 2015 WL 5895213, at *7 (10th Cir. BAP Oct. 8, 2015) (unpublished) (same).

[35]    *In re Kopexa Realty Venture Co.*, 213 B.R. at 1022 (citations omitted).

[36]    *Official Comm. of Unsecured Creditors of W. Pac. Airlines, Inc. v. W. Pac. Airlines, Inc. (In re W. Pac. Airlines, Inc.)*, 219 B.R. 575, 579 (D. Colo. 1998) (quoting *In re The Hermitage Inn, Inc.*, 66 B.R. 71, 72 (Bankr. D. Colo. 1986)).

Compromise, we are not left with a definite and firm conviction that the Bankruptcy Court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances. However, as the Debtor assigns multiple errors to the Bankruptcy Court's findings and conclusions, we review each assignment of error in turn, beginning with the Bankruptcy Court's analysis of the *Kopexa* factors.

### 1.    Factor 1: The Probable Success of the Underlying Litigation

The Debtor argues that the Bankruptcy Court disproportionately emphasized circumstances that diminished the likelihood of success of the litigation. First, the Debtor argues the Bankruptcy Court incorrectly applied the four-year statute of limitations for oral contracts instead of the six-year statute for written contracts. In particular, he asserts that because the Business Loan and subsequent renewals are ambiguous, evidence of contemporaneous oral agreements would be allowed to interpret the written contract. And since contemporaneous oral agreements of an ambiguous contract merge into the written agreement, the Debtor concludes that the six-year statute of limitations applies.[37] The Debtor argues "there is no question that the contract is ambiguous" because "the contract states plainly that its purpose is to *extend the maturity date of the loan.*"[38] However, the June Renewal of the Business Loan modified the maturity date to December 1, 2010. Therefore, as the June Renewal eliminated the thirty-year term, the December Renewal

---

[37]    *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993) ("The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear." (citing *C.R. Anthony Co. v. Loretto Mall Partners*, 817 P.2d 238, 242-43 (N.M. 1991))).
[38]    Appellant's Br. 17.

served to extend the maturity date from December 1, 2010, to April 1, 2011. Regardless, the Bankruptcy Court correctly identified the statute of limitations defense, at the very least, as an impediment to the Trustee's success in the litigation.[39]

Next, the Debtor argues that the Bankruptcy Court erred in assessing his credibility and finding no evidence of fraud in the acceleration of the maturity date. We defer to the Bankruptcy Court's judgment of a witness's credibility.[40] In addition to its assessment of the Debtor's testimony, the Bankruptcy Court based its credibility findings on the Debtor's own contradictions, noting that he scheduled the value of the litigation claims at $6,748 but testified he suffered approximately $30,000,000 in damages. The record supports this finding. With respect to the Debtor's fraud claim, he argues that the Bankruptcy Court failed to consider the twenty-year banking relationship he had with LANB, which he claims lends credibility to his "contention that he was advised by LANB the renewal agreement was . . . an agreement *extending* the maturity date."[41] Although courts may rely on circumstantial evidence to deduce fraudulent intent,[42] the banking relationship is insufficient to support the Debtor's claim of fraud. The Bankruptcy Court's decision must "bear a 'rational relationship to the supportive

---

[39] *See In re W. Pac. Airlines, Inc.*, 219 B.R. at 579 (explaining the bankruptcy court is not required to resolve issues but only identify and weigh them as factors).

[40] *See* Fed. R. Civ. P. 52(a)(6), made applicable in adversary proceedings by Fed. R. Bankr. P. 7052; *Gillman v. Ford (In re Ford)*, 492 F.3d 1148, 1157 (10th Cir. 2007) ("When findings are based on determinations regarding the credibility of witnesses, [Fed. R. Civ. P.] 52(a) demands even greater deference to the trial court's findings." (quoting *Dalton v. IRS*, 77 F.3d 1297, 1302 (10th Cir. 1996))).

[41] Appellant's Br. 19.

[42] *Job v. Calder (In re Calder)*, 907 F.2d 953, 956 (10th Cir. 1990).

14

evidentiary data.'"[43] It is clear from the record that LANB worked with the Debtor, providing him two extensions on the acceleration of the Business Loan. Furthermore, LANB's subsequent foreclosure suggests that it intended to collect on the defaulted obligation despite the longstanding relationship.

The Debtor also assigns error to the Bankruptcy Court's conclusion that the claims were likely barred by a preclusion doctrine. The Debtor points out that LANB and the Trustee argued the claims were mandatory counterclaims in the foreclosure of the Personal Loan, not the Business Loan. The Bankruptcy Court admitted such a defense may not be "bulletproof" because LANB's initial foreclosure claim subject to mandatory counterclaims was dismissed. Thus, the Bankruptcy Court did not place substantial weight on this defense but instead recognized it as an additional nuisance the Trustee would have to overcome to prevail on the estate's claims.

Finally, the Debtor argues the Bankruptcy Court erred in (1) determining LANB was entitled to offset; and (2) failing to recognize the account freeze was just as harmful as the offset. The record does not support the suggestion the Debtor was not in default. The promissory notes and subsequent renewals evidence the maturity dates on their face and the Debtor's uncorroborated and incredible testimony does not suggest otherwise. Furthermore, the Debtor admitted to defaulting on the Business, Personal, and Short Term Loans in an affidavit attached to the Objection. Accordingly, even if the

---

[43] *In re Ford*, 492 F.3d at 1157 (quoting *Gillman v. Sci. Research Prods. Inc. of Del. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 555 (10th Cir. 1995)).

15

Bankruptcy Court failed to consider the impact of the account freeze, nothing in the records supports finding the freeze was unauthorized. Thus, the Debtor's argument fails.

## 2. Factor 2: The Possible Difficulty in Collection of a Judgment

The Debtor asserts the Bankruptcy Court did not analyze the difficulty of collecting on a judgment but instead suggested recovery must exceed $400,000 to offer a greater distribution to creditors than under the settlement. While analysis of the second factor typically focuses on the defendant's ability to pay, it can also encompass problems that the Bankruptcy Court identified, including costs that would have to be incurred in pursuing the judgment.[44] Those costs undoubtedly make collection more difficult, and we assign no error to the Bankruptcy Court's consideration of those costs. But even if the second *Kopexa* factor refers exclusively to the defendant's ability to pay, "the court need not resolve all of [the factors] but must only identify them 'so that the reasonableness of

---

[44] Analysis of the second factor in this case acutely brings to the forefront the question of whether the *Kopexa* factors are exhaustive. As a contrast to *Kopexa*, the court *In re Remsen Partners, Ltd.*, 294 B.R. 557 (Bankr. S.D.N.Y. 2003), for example, phrased the second factor as "the difficulties, if any, to be encountered in the matter of collection." *Id.* at 565. The use of the plural broadens the categories of problems parties and bankruptcy courts may consider in evaluating the second factor. As the Bankruptcy Court's analysis in this case demonstrates, problems other than the defendant's ability to pay can be relevant to the Rule 9019 inquiry. Reading *Kopexa*—with its singular "difficulty"—to refer only to the defendant's ability to pay could ignore other collectability issues that may bear on the reasonableness of settlement and therefore circumscribe a judge's purview. We do not read "difficulty" so narrowly and, indeed, have on occasion used the plural form in prior decisions. *See Lewis v. McCallum (In re Lewis)*, 378 B.R. 418, 2007 WL 2189343, at *4 (10th Cir. BAP July 31, 2007) (unpublished) (rendering the second *Kopexa* factor as the "possible problems in collecting the judgment"). But these interpretative problems highlight the need to answer the question whether *Kopexa*'s standard must be followed to the letter, or whether its factors can be modified or even added to.

the settlement may be evaluated.'"[45] Failure to consider the defendant's ability to pay, by itself, is not grounds for reversal.

Moreover, the Bankruptcy Court's discussion of the second factor goes to the heart of the Rule 9019 inquiry: a cost-benefit analysis.[46] The Bankruptcy Court's review of the cost-benefit analysis contributed to its decision to approve the settlement, and we find no error with that analysis.

### 3. Factor 3: The Complexity and Expense of the Litigation

The Debtor assigns error to the Bankruptcy Court's conclusion that hiring expert witnesses and counsel would be cost-prohibitive. The Debtor argues his experience as a "sophisticated businessman" qualified him to serve as an expert on damages.[47] Again, we defer to the Bankruptcy Court's findings as to the Debtor's credibility, and the record does not persuade us to believe the Debtor's unsupported testimony regarding potential damages. The Debtor also suggests the Trustee could prosecute the claims herself instead of hiring counsel. This argument also asks the Court to substitute its judgment for the judgment of the Bankruptcy Court, which we determine made an informed decision based on an objective analysis of the facts. No matter which counsel pursued the claims against LANB, it would not be done without compensation. The Trustee considered

---

[45]     *In re W. Pac. Airlines, Inc.*, 219 B.R. at 579 (quoting *In re The Hermitage Inn, Inc.*, 66 B.R. at 72).
[46]     *See Suter v. Goedert*, 396 B.R. 535, 547-48 (D. Nev. 2008).
[47]     Appellant's Br. 26.

prosecution of the claims cost-prohibitive based on the likelihood of success on the merits and the Bankruptcy Court agreed. We see no reason to overturn this finding.[48]

### 4. Factor 4: The Interest of Creditors

The Debtor argues the Bankruptcy Court erred in concluding that a settlement for $10,000 was in the creditors' best interest when potential damages exceeded total claims. The Debtor's arguments highlight the conflict between his personal interests and the Trustee's duty to maximize the estate.[49] The only evidence to support the Debtor's valuation of the claims is his uncorroborated testimony that damages were between $15,000,000 and $30,000,000. However, the Bankruptcy Court found the Debtor's scheduled valuation of the claims—$6,748—contradicted his later testimony. Furthermore, the Debtor testified he was not willing to purchase the claims from the bankruptcy estate despite their purported value, casting doubt on his valuation. These findings are not clearly erroneous.

The Debtor's argument also discounts the withdrawal of LANB's $164,259 claim in addition to payment of $10,000. The Trustee testified that the only remaining claims were for credit card debt totaling approximately $7,300, and none of the holders of those

---

[48] *See, e.g.*, *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1146 (1st Cir. 1992) ("[I]t is not surprising that appellants are attracted by the glitter of further litigation financed at the expense of the chapter 7 estate . . . . [I]t is apparent that appellants' intuitive confidence in their own ability to outguess the chapter 7 trustee's settlement decision . . . has more . . . to do with the insignificance of their stake in the settlement.").

[49] *Id.* ("[The debtors'] purpose is inapposite to the duty imposed on a chapter 7 trustee under the [Bankruptcy] Code, since it is not so much the interests of the chapter 7 estate, as it is their self-interest, which [they] would have the chapter 7 trustee champion by refusing to settle the . . . litigation.").

claims objected to the settlement. Since the withdrawal of LANB's claim substantially increased the distribution to the remaining creditors, approval of the settlement was in the best interest of the estate and the Bankruptcy Court did not abuse its discretion in concluding that creditors "stand more to gain with greater certainty through the settlement."[50]

### 5. Remaining Findings and Conclusions

The Debtor also argues the Bankruptcy Court erred in finding the Debtor had knowledge of the modified maturity dates and concluding the Debtor was liable for PBA's debts. The Debtor mischaracterizes the Bankruptcy Court's findings: instead of finding the Debtor knew of the modified maturity dates, the Bankruptcy Court found the Debtor "should have known" of the dates as his signature was on the documents he signed and LANB instituted foreclosure proceedings.[51] The Debtor argues LANB did not authenticate any of the promissory notes or renewals. However, the Debtor did not object

---

[50]     *Tr. July 6, 2018 Hearing* at 19, *in* Appellant's App. at 233. *See Slovak Republic v. Loveridge (In re EuroGas, Inc.)*, 755 F. App'x 825, 833 (10th Cir. 2019) (unpublished) (affirming approval of settlement that eliminated $113,000,000 in burdensome claims and providing payment of $250,000); *Korngold v. Loyd (In re S. Med. Arts Cos.)*, 343 B.R. 250, 257-58 (10th Cir. BAP 2006) (finding no abuse of discretion where settlement provided 60% distribution to creditors that otherwise would have received nothing); *Geltzer v. Original Soupman Inc. (In re Soup Kitchen Int'l Inc.)*, 506 B.R. 29, 43 (Bankr. E.D.N.Y. 2014) (approving settlement that allowed unsecured creditors to receive a 43% distribution on their claims).
[51]     *Tr. July 6, 2018 Hearing* at 15, *in* Appellant's App. at 232.

to the admission of the promissory notes or renewals and such documents are self-authenticating pursuant to Federal Rule of Evidence 902(9).[52]

The Debtor also argues that N.M. Stat. Ann 1978 § 53-11-4.1 shielded him from liability for PBA's debts. However, the Debtor's personal guaranty of PBA's debts is in the record and included "any extensions, renewals, modifications and substitutions" of the original debt.[53] The Debtor did not object to the Bankruptcy Court's review of the personal guaranty. Therefore, the Bankruptcy Court's finding that the Debtor guaranteed PBA's obligations is not clear error, and the Debtor's argument fails.

### 6. Denial of Motion to Continue Hearing

Finally, the Debtor argues the Bankruptcy Court erred in denying his Motion to Continue. Denial of a motion to continue is reviewed for an abuse of discretion, and reversal is not appropriate unless "the denial was arbitrary or unreasonable and materially prejudiced the appellant."[54] The Tenth Circuit provides several factors to consider in determining whether denial of a continuance constitutes an abuse of discretion. Those factors include:

> the diligence of the party requesting the continuance; the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; [and] the need

---

[52] *Niederquell v. Bank of Am. N.A.*, 696 F. App'x 321, 324 (10th Cir. 2017) (citing 31 Charles Alan Wright & Arthur R. Miller, *Fed. Practice and Pro.* § 7143 (1st ed. 2017)).

[53] *Exhibit I to Amended Complaint for Foreclosure of Mortgages and For Debt and Money Due, Guaranty* at 1, *in* Appellant's App. at 64.

[54] *Rogers v. Andrus Transp. Servs.*, 502 F.3d 1147, 1151 (10th Cir. 2007) (quoting *United States v. West*, 828 F.2d 1468, 1469 (10th Cir. 1987)).

asserted for the continuance and the harm that appellant might suffer as a result of the [bankruptcy] court's denial of the continuance.[55]

The Debtor argues he did not have sufficient time to review the renewal notes prior to the hearing based on LANB's delays in turning them over. Yet these documents were not new to the Debtor as they bear his signature and served as the basis of LANB's July 2011 foreclosure action. Furthermore, the Debtor failed to provide a transcript of the hearing on the Motion to Continue in the record, thus we summarily affirm the denial of the Motion to Continue.[56]

## IV.    CONCLUSION

The Bankruptcy Court developed facts and made an objective evaluation of those facts, as required by Tenth Circuit law, in reviewing the proposed settlement. Its conclusion that the settlement fell well within the range of reasonableness was informed by an analysis of the *Kopexa* factors. We assign no error to the use of those factors, the Bankruptcy Court's application of them to the facts of this case, or the Bankruptcy Court's ultimate decision to grant the Motion to Compromise and approve the underlying settlement. Because we do not have a definite and firm conviction that the Bankruptcy

---

[55]    *Id.* (quoting *West*, 828 F.2d at 1470).

[56]    *Tollefsen v. US Bank Nat'l Ass'n (In re Tollefsen)*, No. NO-07-057, 2008 WL 762487, at *1 (10th Cir. BAP Mar. 11, 2008) (unpublished) ("[T]he failure to provide a trial transcript on appeal warrants affirming the trial court when the issue on appeal requires the appellate court to review the record in the trial court." (citing *McGinnis v. Gustafson*, 978 F.2d 1199, 1201 (10th Cir. 1992))); *OU Fed. Credit Union v. Inkster (In re Inkster)*, Nos. WO-00-063, 00-12923, 2001 WL 169758, at *2 (10th Cir. BAP Feb. 21, 2001) (unpublished) ("Without a transcript, we have an inadequate record, giving us grounds to summarily affirm the bankruptcy court.").

Court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances, the Order Approving Settlement is AFFIRMED.